UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MIYA TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:21 CV 702 RWS |
| | ) | |
| KILOLO KIJAKAZI[1], | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

Miya Taylor brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) seeking judicial review of the Commissioner's decision denying her

application for disability benefits under the Social Security Disability Insurance

Program (SSDI), Title II of the Social Security Act, 42 U.S.C. §§ 401-434 and for

benefits under the Supplemental Security Income Program (SSI), Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381-1385.  For the reasons set forth below, I

will affirm the decision of the Commissioner.

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## Procedural History

Plaintiff Miya Taylor was born on January 3, 1989.  She is currently 33 years old.  Taylor has a high school diploma and has completed 3 years of college.  (Tr. 341.)  In the past several years before she applied for disability benefits Taylor worked as a customer service / cashier, personal assistant, and an office coordinator.  (Tr. 328.)  Taylor had employment earnings of $37,651.97 in 2018 and $17,552.84 in 2019.  The last job Taylor held was as a front office coordinator at a charter high school.  (Tr. 328.)  The last time she worked was at the end of the school year on May 24, 2019, because of her migraine and epilepsy conditions.  (Tr. 340.)

Taylor protectively filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on May 13, 2019.  (Tr. 214 and 215.)  She asserts that she became disabled beginning November 26, 2018, because of her physical health conditions of epilepsy and migraines, and her mental health conditions of anxiety and depression.  (Tr. 192.)  Taylor later amended her disability onset date to be May 24, 2019.  (Tr. 316.)

Taylor's applications were initially denied on November 15, 2019.  (Tr. 214 and 215.)  After a hearing before an Administrative Law Judge (ALJ) on August 26, 2020, the ALJ issued a decision denying benefits on October 14, 2020.  (Tr.

11-27.)  On April 23, 2021, the Appeals Council denied plaintiff's request for review.  (Tr. 1-4.)  The ALJ's decision is now the final decision of the Commissioner.  42 U.S.C. §§ 405(g) and 1383(c)(3).

In this action for judicial review, Taylor contends that the ALJ's residual functional capacity (RFC) lacks an accommodation for when Taylor has a seizure or headache at work; the ALJ failed to properly evaluate opinion evidence; and the ALJ's conclusion that Taylor's anxiety and depression are not severe is not supported by substantial evidence.  Taylor requests that I reverse the Commissioner's final decision and remand for an award and calculation of benefits or remand this matter for further evaluation.  For the reasons that follow, I will deny Taylor's request to remand this matter for an award of benefits or for further proceedings.

### Medical Records and Other Evidence Before the ALJ

With respect to the medical records and other evidence of record, I adopt Taylor's statement of material facts (ECF # 20) and the Commissioner's statement of additional facts  (ECF # 23-2).  Additional facts will be discussed as needed to address the parties' arguments.

### Discussion

A.    <u>Legal Standard</u>

To be eligible for disability insurance benefits under the Social Security Act,

a plaintiff must prove that she is disabled.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  <u>See</u> 20 C.F.R. § 404.1520; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity (SGA).[2]  If not, the disability analysis proceeds to the second step.  In this step the Commissioner decides

---

[2] "Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. 'Substantial work activity' is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)).  'Gainful work activity' is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975).  If an individual engages in SGA, she is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience." (Tr. 12.)

4

whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled and the analysis ends.  If the claimant has a severe impairment the Commissioner then proceeds to the third step and determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled.  If the impairment is not equivalent to a listed impairment, then the Commissioner proceeds to the fourth step to determine whether the claimant can perform her past relevant work.[3]  If so, the claimant is not disabled. If not, at the last step the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

I must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  Johnson v. Apfel, 240

---

[3] "The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965)."  (Tr. 13.)

F.3d 1145, 1147 (8th Cir. 2001). "[Substantial evidence] means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (cleaned up). Determining whether there is substantial evidence requires scrutinizing analysis. Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007).

I must consider evidence that supports the Commissioner's decision as well as any evidence that fairly detracts from the decision. McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010). If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision. Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012). I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome. McNamara, 590 F.3d at 610.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski

v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> [The] claimant's prior work record, and observations by third
> parties and treating and examining physicians relating to such
> matters as: (1) the claimant's daily activities; (2) the duration,
> frequency, and intensity of the pain; (3) precipitating and
> aggravating factors; (4) dosage, effectiveness and side effects of
> medication; and (5) functional restrictions.

Id. at 1322.[4]  When an ALJ explicitly finds that the claimant's testimony is

not credible and gives good reasons for the findings, the court will usually defer to

the ALJ's finding.  Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).  However,

the ALJ retains the responsibility of developing a full and fair record in the non-

adversarial administrative proceeding.  Hildebrand v. Barnhart, 302 F.3d 836, 838

(8th Cir. 2002).

B.    ALJ's Decision

In her written decision, the ALJ found that Taylor had not engaged in

substantial gainful activity since May 24, 2019, the alleged onset of her disability.

(Tr. 14.)  The ALJ found that Taylor had the following severe impairments:

epilepsy and migraines.  (Id.)  The ALJ found plaintiff had non-severe mental

impairments of anxiety and depression because they did not cause more than

---

[4] This was once referred to as a credibility determination, but the agency has now eliminated use of the term "credibility" to clarify that subjective symptom evaluation is not an examination of an individual's character. However, the analysis remains largely the same, so the Court's use of the term credibility refers to the ALJ's evaluation of whether a claimant's "statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record."  See SSR 16-3p, 2017 WL 5180304, at *8 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3); Lawrence v. Saul, 970 F.3d 989, 995 n.6 (8th Cir. 2020) (noting that SSR 16-3p "largely changes terminology rather than the substantive analysis to be applied" when evaluating a claimant's subjective complaints).

minimal limitations in Taylor's ability ability to work.  (Id.)  The ALJ determined that Taylor's impairments or combination of impairments did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16.)  The ALJ found Taylor to have the residual functional capacity (RFC) to perform a full range of work at all exertional levels with the following non-exertional limitations:

> [Taylor] can never climb ropes, ladders, or scaffolds. She can perform work in an environment with not more than a moderate noise level as defined in the *Selected Characteristics of Occupations*. She cannot drive for work. She can have no exposure to hazards such as unprotected heights or unprotected machinery and no more than occasional exposure to dust, flames, odors, or gases. She can perform work limited to simple, routine, repetitive tasks. She can make simple, work-related decisions., adapt to few, if any, workplace changes that are introduced gradually.  She can perform work that is not at a production pace rate, defined as work with an assembly line or conveyor belt.

(Tr. 17-18.)  The ALJ determined that Taylor is unable perform any past relevant work.  (Tr. 25.)  The ALJ consulted a vocational expert (VE) to assess whether jobs within Taylor's RFC existed in significant numbers in the national economy.  (Tr. 26.)  The VE identified the jobs of a retail clerk (4,000,000 positions); a dining attendant (430,000 positions); and a housekeeper (900,000 positions).  (Tr. Id.)  The ALJ therefore determined that plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 27.)

C.    Taylor's Testimony and Medical Records

There is no dispute that Taylor has the physical health conditions of epilepsy and migraines and that she has the mental health conditions of anxiety and depression.  Taylor disputes the ALJ's determination of the severity of those conditions and how they affect her ability to perform any type of gainful employment.

In her testimony at the hearing with the ALJ Taylor testified that she stopped working at her last job because her "seizures had continued to increase and we thought that it was due to overstimulation and stress."  (Tr. 167.)  Taylor testified that she had two kinds of seizures.  She has had grand mal seizures[5] between one and six times a month.  When she has these her body goes completely stiff and she has to be protected from falling to the ground.  The seizures last between two and four minutes.  She is then disoriented for 15 to 30 minutes afterwards.  She is very tired and sleeps most of the next two or three days with body soreness that lasts between three to five days.  She testified that she has had these seizures since August 16, 2005.  (Tr. 174-176.)

---

[5] A grand mal seizure causes a loss of consciousness and violent muscle contractions.  It is cause by abnormal electric activity in the brain.  It is usually caused by epilepsy.  People with recurrent grand mal seizures may take anti-seizure medication to control and prevent grand mal seizures.  The Mayo Clinic, Rochester, Minn. https://www.mayoclinic.org/diseases-conditions/grand-mal-seizure/symptoms-causes/syc-20363458.

Taylor testified that she also has "absent" seizures.[6]  Taylor stated that she becomes disoriented and can't register where she is or what she is doing.  One time she was driving, experienced an episode, and had to pull over because she did not know where she was or why she was there, so she had to go straight home.  (Tr. 177.)  Taylor testified that the absence seizures last twenty seconds to a minute.  She stated that she feels anxious after an episode but that she is able to resume her normal activities.  (Tr. 178.)

Taylor also testified that she has migraines and that they can occur two or three hours after she has had an absence seizure.  When she gets a migraine she tries to go to a dark room or dim the lights, look away from a computer screen, and be in a quiet place to lessen the stimulation to her brain.  (Tr. 178-179.)  Taylor testified that she gets migraines three to seven days a week and that they happen almost daily.  They can last 15 minutes and sometimes up to four hours.  (Tr. 179)

Taylor testified that that she receives medical treatment for her seizures and migraines from her neurologist, Mohamed Bakhit, M.D.  He has treated her since 2017 or 2018.  (Tr. 179.)  She also testified that she asked Dr. Bakhit if there was a way to find how "my work and experience and everything affected my brain."  Dr. Bakhit referred her for a neuropsychology consultation with Dr. Angela Capps.

---

[6] Absence seizures involve brief, sudden lapses of consciousness.  Someone having an absence seizure may look like she is staring blankly into space for a few seconds.  Then, there is a quick return to a normal level of alertness. They can usually be controlled with anti-seizure medications.  The Mayo Clinic, Rochester, Minn. https://www.mayoclinic.org/diseases-conditions/petit-mal-seizure/symptoms-causes/syc-20359683.

Taylor stated that Dr. Capps administered tests and opined that Taylor needed trauma therapy based on Taylor's answers to the tests.  (Tr. 179-180.)

Taylor also testified that she suffers spells of depression, "not always but sometimes."  (Tr. 181.)  Her depression has kept her from getting out of bed "like up to a week."  She also stated that she has anxiety at least once a week.  Taylor testified that she has not sought treatment from a mental health professional since she met with Dr. Capps.  (Tr. 182.)

Taylor testified that her (great) grandmother would come to Taylor's house to visit almost every day.  He grandmother would drive Taylor to the store when she could not drive.  (Tr. 184.)  She also testified that her live-in boyfriend helps her to remember to take her medications.  (Tr. 184-185.)

In support of her application for benefits, Taylor submitted two *Witness' Statement Regarding Claimant's Seizure* forms filled out by her great grandmother and her boyfriend.  Taylor's great grandmother, Lynn Bass, completed the form on July 21, 2020.  She indicated that she had witnessed Taylor have 8 seizures, the last time in 2012-2014.  She had not witnessed Taylor having any seizures in the last six months.  (Tr. 429.)  Bass stated that she believed stress from school and work were precipitating factors for Taylor's seizures.  (Tr. 431.)

Taylor's boyfriend, James Watford II, completed his form on July 21, 2020. He indicated that he has witnessed Taylor have 10+ seizures, 3 in the past six

months and one in the past month.  (Tr. 433.)  Watford stated that he has witnessed

Taylor having seizures one to four times pe month and one to twelve times per

year.  (Tr. 434.)  The last seizure he witnessed was on July 9, 2020 when she

screamed and her body was contorted.  He stated that Taylor's job at the charter

high school was a high stress position which began to lead to Taylor's headaches

and, ultimately, seizures.  (Tr. 435.)  Watford stated that Taylor has many "staring

spells and absent seizures" and he believes that stress related activities greatly

increase her chances of having a seizure.  (Tr. 436.)

Taylor's medical records reflect that she has been receiving treatment for

epilepsy and migraines.  Her medical records do not reflect that same level of

severity of her conditions that Taylor testified about at her hearing with the ALJ.

On November 26, 2018, approximately six months before her May 24, 2019

onset date, Taylor had a brain MRI which showed no abnormalities.  (Tr. 45-454.)

On April 25, 2019, Taylor was seen by Dr. Bakhit.  She reported that she

had a seizure in early November, 2018.  She reported that her mind went blank and

it took up to 15 minutes to recover.  She had not had any seizures since then.  She

also reported daily pressure-like headaches.  They may last all day but they were

not disabling.  She stares at a computer screen 8-9 hours per day.  She takes

Tylenol up to three times a week but she waits until she gets home to take it.  Her

jobs is very stressful.  She reported that her last grand mal type seizure was two

years earlier in July or August 2017.  The medical report reflects that Taylor has been prescribed levetiracetam to control her seizures.  This medication may be causing her headaches.  (Tr. 447-448.)  Dr. Bakhit prescribed venlafaxine to treat anxiety / depression and as a headache prevention.  He also prescribed 500 mg of Naproxin as an acute treatment for headaches.  He would also provide her with resources for therapy options to address depression and anxiety.  (Tr. 451.)

On May 10, 2019, Taylor saw her primary care physician, Dr. Fredrick Balch, and reported high anxiety and stress.  She was fearful she was going to have another seizure and leave her daughter without a mom.  The report notes that Taylor was prescribed Effexor for her migraines and mood / anxiety prevention but that Taylor may have not taken the prescription.  Dr. Balch recommended Taylor establish care with a mental health therapist.  (Tr. 461-465.)

On August 9, 2019, Taylor returned to see Dr. Bakhit for a follow-up visit regarding her seizures and headaches.  Taylor reported that she continued to have episodes of transient confusion which are brief, lasing15-30 seconds.  She had these episodes 3-4 times per month.  She gets a pressure headache on average three times a week.  They typically last "30 minutes or so" and are nondisabling.  She no longer worked at her job (at the charter high school) which was very stressful and increased the frequency of her headaches because typing and looking at a bright

13

computer screen for hours were headache triggers.  (Tr. 480.)  The report does not note any issues with depression or anxiety.  (Tr. 482.)

On November 6, 2019, State agency mental health consultant, Mark Altomari, Ph.D. reviewed Taylor's available medical records submitted in support of her disability application.  Dr. Altomari opined that Taylor did not have a severe mental impairment.  (Tr. 208.)  Dr. Altomari found that Taylor had mild limitations in understanding, remembering, or applying information; mild limitations in interacting with others; mild limitations in concentrating, persisting or maintaining pace; and mild limitations in adapting or managing oneself.  (Tr. 207.)

On November 14, 2019, State agency medical consultant, Dennis McGraw, D.O. reviewed Taylor's available medical records submitted in support of her disability application.  Dr. McGraw opined that Taylor did not have any exertional limitations but should avoid moderate exposure to hazards, and avoid concentrated exposure to noise, and fumes, odors, dusts, gases, and poor ventilation.  (Tr. 198-200, 209-2011.)

On January 27, 2020, Taylor met with Dr. Bakhit and reported that she had had a seizure early the prior Saturday morning while sleeping after feeling upset and emotional following the break-up with her boyfriend the previous evening.  She woke up with body soreness that has persisted for two days.  She reported that she was prone to anger outbursts since being prescribed levetiracetam (Keppra)

14

and she attributes nausea and headaches to the drug.  She also stated that she continued to have episodes of transient confusion 3-4 times a month where her mind goes blank for 15-30 seconds.  But she recovers quickly.  She also continued to have tension headaches on a daily basis that last 30-60 minutes but they are nondisabling.  She takes Tylenol as needed but avoids taking it on most days.  (Tr. 494.)  The report does not note any issues with depression or anxiety. (Tr. 496.) Dr. Bakhit discontinued Taylor's prescription for levetiracetam and prescribed lamotrigine instead.  He noted that this drug was a good antiepileptic drug and was an excellent mood stabilizer.  (Tr. 498.)

On May 8, 2020, Dr. Bakhit completed a *Seizures Residual Functional Capacity Questionnaire* regarding Taylor's medical condition.  He diagnosed Taylor with partial idiopathic epilepsy and headaches.  She had seizures 3-4 times per month, that last one being reported by Taylor occurred on March 18, 2020.  He noted that increased stress and missed medication were precipitating factors for her seizures.  He noted that Taylor did not have a history of injury during a seizure. He also noted that Taylor occasionally misses her medication.  Dr. Bakhit opined that Taylor's seizures were not likely to interrupt co-workers; Taylor would not need more supervision at work than an unimpaired worker; that Taylor should be monitored and kept from hurting herself after a seizure; and that she should not drive or work at heights or work with power equipment.  Dr. Bakhit also opined

15

that Taylor did not need to take unscheduled breaks during an 8-hour work day; that she was capable of low stress jobs because stress caused her increased headaches; and that Taylor's seizures were not likely to produce "good days" and "bad days."  Finally, he noted that these limitations were in effect since August 2018, approximately nine months before Taylor's alleged onset date (Tr. 486-490.)

On June 11, 2020, Taylor underwent a follow-up telehealth visit with Dr. Bakhit.  She reported a convulsive seizure on May 5, 2020.  Taylor reported that she has transient confusion 2-4 times per month that lasts 15-30 seconds with no post-event confusion.  She has not had frequent headaches since her last visit on January 29, 2020, although she has been under significantly more stress over that past week because she is moving and not sleeping well.  (Tr. 500-501.)  Taylor noted that her prescription of lamotrigine resolved her emotion instability.  The report does not note any issues with depression or anxiety.  (Tr. 502.)  Dr. Bakhit noted that he was "no longer sure that [Taylor's] brief events with inattentiveness are focal seizures."  (Tr. 504.)  He continued Taylor on her medications and recommended a follow-up visit in six months.  (Id.)

On June 15, 2020, Taylor received treatment from Dr. Stephanie Liebmann for back and hand pain.  Taylor did not report any headaches or psychiatric concerns.  She also was not taking any over-the-counter medications for pain.  (Tr. 506-508.)

On August 7, 2020, Taylor was seen by Ramadevi Devabhaktuni, M.D. for an initial visit to establish care.  During the visit Taylor completed a *Patient Health Questionnaire* (PHQ-2), a questionnaire that measures the presence and severity of depression.[7]  Taylor scored a "0" which indicates no depressive symptoms.  (Tr. 518.)  She denied having headaches or dizziness (Tr. 520.) and her neurological examination findings were unremarkable.  (Tr. 520-521.)

On August 12, 2020, based on a referral from Dr. Bakhit Taylor underwent a neuropsychology consultation with Angela Capps, Ph.D.  Taylor reported her current mood to be distressed and had reduced sleep, a decreased appetite, anxiety when "calling somewhere or answering the phone" and had obsessive symptoms. (Tr. 511.)  Taylor was visibly shaken when she arrived at her appointment.  She stated she was stressed because there was flooding in the area and she was worried about coming to the appointment.  Her mood became stable as she became comfortable with being in the office.  (Tr. 512.)  Taylor had normal neurocognitive functioning, and stated that she was independent in her basic and instrumental activities of daily living.  Taylor reported that she had a high degree of psychological distress.  Based on Taylor's representations Dr. Capps recommended

---

[7] American Psychological Association, https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/patient-health.

that Taylor not return to school or work until she received treatment for her psychiatric distress.  (Tr. 510-513.)

D.   Taylor's Objections to the ALJ's Decision

*The RFC Lacks Accommodations For When Taylor Has A Seizure Or Headache At Work.*

The ALJ determined that Taylor had severe impairments based on her seizures and headaches but that she could still perform gainful employment activities in low stress jobs limited to simple, routine, and repetitive tasks.  (Tr. 18.)   Taylor asserts that The RFC fails to make any limitations for when she has a seizure at work.  However, the RFC does limit environmental stimuli (noise, unprotected heights, exposure to dust, fumes, odors, or gases) and stressful job requirements that would trigger Taylor's headaches and seizures.  There is substantial evidence in the record that Taylor's headaches and seizures are influenced by a stressful job and by staring at a computer screen all day. Moreover, there is substantial evidence in the record that conflicts with Taylor's reports of the frequency and duration of her headaches and seizures.  She testified at her hearing that she has grand mal seizures between one and six times a month. But the medical records of her treating neurologist, Dr. Bakhit, indicate that any grand mal seizures are very infrequent and that Taylor had milder absence seizures

between one and four times a month.  These seizures only last for 15 to 30 seconds and Taylor recovers quickly.  Her prescription medicine was working well to control the seizures.

Taylor also testified that she had migraine headaches three to seven days a week and almost every day.  They last from 15 minutes to four hours.  She stated that a possible trigger is work stress and staring at a computer screen for 8-9 hours per day.  However, in numerous examinations by Dr. Bakhit, he recorded that her tension headaches on average three times a week and that they typically last "30 minutes or so" and are nondisabling.  Taylor has predominately been prescribed over-the-counter pain medications for her headaches which she takes sparingly.  In addition the November 26, 2018 MRI of Taylor's brain did not find any abnormalities.

Dr. Bakhit's seizure questionnaire noted that increased stress and missed medication were precipitating factors for her seizures.  Dr. Bakhit opined that Taylor's seizures were not likely to interrupt co-workers; Taylor would not need more supervision at work than an unimpaired worker; that Taylor should be monitored and kept from hurting herself after a seizure; and that she should not drive or work at heights or work with power equipment.  Dr. Bakhit also opined that Taylor did not need to take unscheduled breaks during an 8-hour work day; that she was capable of low stress jobs because stress caused her increased

headaches; and that Taylor's seizures were not likely to produce "good days" and "bad days."  (Tr. 486-490.)  I find that the foregoing is substantial evidence in support of the ALJ's accommodation of Taylor's seizures and headaches in the RFC.  Work in low stress jobs like a cashier, dining attendant, or housekeeper would eliminate Taylor's looking at a computer screen all day and allow her to greatly reduce the possible triggers for her seizures and headaches.

*The ALJ's Decision Fails to Properly Evaluate Opinion Evidence*

Taylor argues that supportability and consistency are the most important factors in determining the persuasiveness of medical opinions.  Those factors also include the length of the relationship with the claimant, the frequency of examinations, the purpose of the examinations, the specialization of the medical source, and whether the medical source has familiarity with other evidence in the claim.  Taylor alleges that the ALJ's decision failed to analyze the supportability and consistency of the opinions of the State agency medical consultant Dr. Dennis McGraw and Taylor's treating physician Dr. Bakhit.

The ALJ cited Dr. McGraw's opinion which listed in detail the medical records he reviewed in support of his opinion.  He also thoroughly described Taylor's daily activities.  The ALJ discussed in detail Taylor's exertional limitations and non-exertional limitations that show Dr. McGraw's opinion was

consistent with this evidence.  (Tr. 17-25.)  I find that the ALJ's decision analyzed the supportability and consistency of Dr. McGraw's opinion.

Taylor makes a similar argument with the ALJ's discussion of Dr. Bakhir's opinion.  She asserts that the ALJ failed to discuss how his opinions were supported and how his limitations were consistent with the evidence.  The ALJ found that some of Dr. Bakhit's opinions were persuasive and some were not based on the evidence in Dr. Bakhit's treatment notes.  (Tr. 23.)  The ALJ's reliance on Dr. Bakhit's treatment notes, in combination with the ALJ's discussion of Dr. Bakhit's multiple examinations and findings (Tr. 20-25.), satisfies the ALJ's duty to analyze Dr. Bakhit's opinion's persuasiveness.

*The ALJ Erred By Not Finding Taylor's Depression And Anxiety To Be Severe Impairments*

Taylor argues that the ALJ should have found Taylor's depression and anxiety to be severe.  Although the record contains substantial evidence that Taylor suffered from anxiety and depression, it also contains substantial evidence that these conditions were not severe.  The State agency mental health consultant, Dr. Mark Altomari, opined that Taylor did not have a severe mental impairment.  In multiple visits with Dr. Bakhit Taylor's mental status findings were normal.  The ALJ noted the evidence of Taylor's depression and anxiety only minimally impacted Taylor's ability to do basic work activities.  (Tr. 14-15.)  Taylor reported

to Dr. Capps that she was independent in her basic and instrumental activities of daily living.  (Tr. 512.)  As a result, I find that substantial evidence supports a finding that Taylor's depression and anxiety were not severe.

## Conclusion

Based on the record as a whole in this case, I find that the ALJ's conclusions regarding Taylor's RFC and her conclusion that Taylor's depression and anxiety are not severe are supported by substantial evidence.

Accordingly,

**IT IS HEREBY ORDERED that** the final decision of the Commissioner of Social Security is affirmed.

**IT IS FURTHER ORDERED that** The Clerk of Court shall substitute Kilolo Kijakazi, Acting Commissioner of Social Security, as the defendant in this matter.

A separate Judgment is entered herewith.


_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE


Dated this 30th day of September, 2022.